UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MICHAEL FECI, | No. 2:20-cv-00878-DJC-CKD |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| ROBERT BURTON, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se and in forma pauperis in this habeas corpus action filed pursuant to 28 U.S.C. § 2254. Petitioner challenges his voluntary manslaughter conviction for shooting his roommate, Matthew Lambert.[1] Upon careful consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application on the merits.

**I.    Factual and Procedural History**

Following a jury trial in the Sacramento County Superior Court, petitioner was convicted of voluntary manslaughter with a firearm enhancement. ECF No. 1 at 1-2. In so doing, the jury found petitioner not guilty of both murder in the first and second degree as the prosecution had argued.[2] See ECF No. 65-3 at 192 (verdict form). On January 5, 2018, he was sentenced to a

---

[1] Hereinafter referred to as "Lambert."

[2] Petitioner was charged with the first degree murder of Lambert, but the prosecution argued,

1

total prison term of 15 years. ECF No. 65-4 at 9 (Felony Abstract of Judgment).

Petitioner appealed to the California Court of Appeal which affirmed his conviction. ECF No. 65-8 (direct appeal opinion). The California Supreme Court denied his petition for review on February 26, 2020. ECF No. 65-10.

After independently reviewing the record, this court finds the state appellate court's summary of the evidence accurate and adopts it herein.[3]

> Lambert and a close friend, Michael Carbahal, moved into a house together in September 2015. The following summer, they allowed [petitioner], his wife, K., and four children to move into the house.[4] [Petitioner] had known Lambert for five or six years and, according to his testimony, considered Lambert to be his "best friend." He had not known Carbahal for as long, about three years, and met him through Lambert. Carbahal suffered from and took medication for several mental health issues, including depression, anxiety, bipolar disorder, and schizophrenia, during the time he lived in the house. [Petitioner] and his family moved into the house about two months before the events resulting in Lambert's death.
>
> We begin our recitation of these events a day or two before Lambert died. Lambert's girlfriend, V., was over at the house. While intoxicated, she became involved in some sort of dispute with one of the neighbors and began spraying a hose at the neighbor over the back yard fence. Law enforcement officers came to the house, but the record is unclear as to the outcome of their visit.
>
> Either the next day or the day after, [petitioner], K., and Carbahal were "sitting around" the house "making jokes" about the incident with the hose. As Carbahal explained, [petitioner] did "an impression" of V. that was "pretty funny." [Petitioner] and K. also expressed concern about V. using methamphetamine and said they did not want drug use at the house. Lambert was at work when this conversation took place, but V. was in his room and overheard enough of what was being said to put together they were talking about her.
>
> When Lambert got home from work that afternoon, V. "told him how they were making fun of [her]." Lambert said he had told them not to make her feel uncomfortable at the house, so he would be moving out; V. said [petitioner] and his family should be the ones to move. They then lay down together and Lambert fell asleep. While Lambert slept, V. got up and picked up pizza for them to eat. When he woke

---

alternatively, that petitioner should be convicted of second degree murder.

[3] See 28 U.S.C. § 2254(e)(1) (emphasizing that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts it by clear and convincing evidence).

[4] In light of the procedural posture of this case, the court has substituted the word "petitioner" for "defendant." These substitutions appear in brackets.

up some time later, they ate some of the pizza and V. told him she would be going back to her house that night. Lambert became upset, went into the kitchen, and started knocking various items off of the counter and onto the floor. He also woke up Carbahal, who was sleeping on a couch in the living room, by flicking him in the forehead with his finger. Lambert asked Carbahal whether he had been talking about his girlfriend and told him, "don't talk shit behind my back." After a brief argument between these two, K. came out of the room she shared with [petitioner] and their children. She told Lambert, "Fuck you," Lambert responded, "Shut up, you fat bitch," and the argument escalated from there, ending a couple minutes later with Lambert telling K. that he wanted them to move out in the next 30 days. Lambert then returned to his room.

[Petitioner] was not at the house when these arguments occurred. He got home a short time later and sat on the arm of one of the couches while Carbahal told him what had happened. Lambert then came out of his room and confronted [petitioner].

Carbahal could not remember what was said between the two, but described the conversation as short and added: "It wasn't even yelling really." When Lambert started to walk back to his room, [petitioner] made a parting comment about V., "something like, for that tweaker broad or something." Hearing the comment, Lambert turned around and said, "talking shit again behind my back." He then rushed [petitioner] and tackled him on the couch.

Lambert, a much larger man than [petitioner], began choking and punching him on the couch. [Petitioner] routinely carried a loaded revolver in a holster on his hip and was so armed when Lambert attacked him. He reached for his gun and removed it from its holster. As [petitioner] did so, Lambert released his throat and tried to take the gun from him. V. came into the living room when the fighting began and told Lambert to stop. Lambert responded that [petitioner] had "pulled a gun on him." K. also came into the living room around this time, said, "fuck that," and jumped on Lambert's back as he and [petitioner] struggled for possession of the gun. At this point, Carbahal also joined in the struggle, saying, "give me the fucking gun." He was "yanking on" the gun in an attempt to disarm both men when "it just went off."

No one was hit by this initial discharge, but both Lambert and Carbahal were knocked to the ground. [Petitioner], still standing and now in sole possession of the gun, pointed it at Lambert and fired a second round. The bullet hit Lambert in the jaw as he sat in a kneeling position on the floor, traveled through the soft tissues of his neck, fracturing the cervical vertebrae, and lodged in his back. Lambert immediately fell face down on the floor. Both K. and Carbahal started yelling at [petitioner]. K. was crying. Carbahal then noticed Lambert was moving. As he described, "it look[ed] like he was trying to do a pushup." Carbahal also described [petitioner]'s response: "And [petitioner] takes two steps towards him and drops aim and he puts one in the back of his head." V. confirmed [petitioner] "stepped forward and shot him again," adding: "It was really quickly." This bullet hit Lambert behind the right ear and traveled forward through

3

his brain from right to left, stopping when it hit bone on the left side of his skull. Loss of consciousness was instantaneous; death from blood loss and neurologic compromise quickly followed.

The foregoing description of the confrontation between [petitioner] and Lambert is supported by the testimony of Carbahal and V., their prior statements to law enforcement officers, and the forensic pathologist's description of the gunshot wounds inflicted on Lambert. [Petitioner], however, told a different story from the witness stand.

[Petitioner] testified Carbahal suffered from schizophrenia and bipolar disorder, routinely abused a variety of drugs, and that he drank alcohol, smoked marijuana, and used methamphetamine on the day Lambert died. He also suspected V. of using methamphetamine, but never actually witnessed her using the substance. The day he shot and killed Lambert, on his way home from taking two of his children to the park, [petitioner] spoke with K., who was "obviously upset" and said she got into an argument with Lambert and wanted to move out of the house. According to [petitioner], K. also told him Lambert threatened to kill him. When [petitioner] got home, his eight-year-old daughter told him the same thing. Rather than confront Lambert about these threats, [petitioner] knocked on his bedroom door because he saw there was pizza in the house and asked if his family could eat some of the pizza. Lambert was "calm, cool, collected, and he said that's fine." Five or ten minutes later, Lambert came out of the room and, as [petitioner] put it, "started talking about how we were talking trash about [V.] and he was upset about that" and went "back and forth between he was moving out to he wanted us to move out in 30 days to he wanted us out that day to us out at the end of the week." At the end of the conversation, which included some yelling and cussing on the part of Lambert, [petitioner] agreed they would be out at the end of the week and Lambert went back to his room.

About half an hour later, Carbahal initiated a conversation with [petitioner] about Carbahal's drug abuse and asked [petitioner] to take him to the methadone clinic. [Petitioner] initially said no because he was "frustrated" and "very upset" with Carbahal for being high around the children. As [petitioner] summarized what transpired next in the conversation: "I started to walk away. And he called back at me again, said and yelled please. And I turned back at him and he had, like, this look in his eyes like a child and he started to cry. And I'm, like, what? He's, like, can you take me to get my meds, please?" Ultimately, [petitioner] agreed to take Carbahal to the clinic the next day because he "felt bad for him" and "was still his friend," as [petitioner] put it: "I didn't want to turn my back on him."

At this point in the conversation, according to [petitioner], Lambert came out of his room and into the living room. [Petitioner] gave Lambert "a friendly hey," prompting Lambert to deliver a "hockey body check shove" that knocked [petitioner] off of the arm of the couch and onto the floor, causing him to hit his head in the entryway of the house.

Lambert then went into the kitchen and broke some glasses and a

plate. When [petitioner] got up, he told Lambert: "I'm not going to put my family in danger over [V.], you, and this whole situation." [Petitioner] believed "evacuating" was his family's only option. As he started walking towards the hallway, [petitioner] "didn't even get a chance to react" before Lambert charged at him, saying, "you're gonna talk shit about my girl, I'll fucking kill you." Lambert then grabbed [petitioner] by the throat with both hands, carried him "five or six feet," and "slammed [him] onto the couch." On the couch, Lambert straddled [petitioner] with his knee on his diaphragm and choked him with both hands for 30 to 40 seconds, during which he made various threats, including that he would kill [petitioner] and his "whore wife." Then Lambert released [petitioner]'s neck with one of his hands and repeatedly punched him in the face.

[Petitioner] "was starting to pass out" when Lambert reached for his gun and, as [petitioner] described, "he had this look in his eye like the wolf wants to eat me." [Petitioner] "was scared to death" and also reached for the gun, but only to try to keep it holstered. When Lambert managed to remove the gun, [petitioner] yelled for Carbahal to help, but he was "just sitting there in his own little world." [Petitioner] and Lambert struggled for control of the gun. Carbahal eventually grabbed the gun as well, but [petitioner] did not want him to have it either considering his mental illness and drug use. During this three-way struggle for control of the gun, K. came into the living room and jumped onto Lambert's back. Carbahal then pulled [petitioner]'s hands away from the gun. Lambert, now with "full control" of the gun, "went back to choking" [petitioner]. As [petitioner] was starting to pass out for the second time, he heard K. pleading for his life and then heard the revolver "go from double action to single action" just before it discharged for the first time.

The discharge caused Lambert to stumble backwards and "somehow" [petitioner] got his gun back. [Petitioner] then yelled for K. to protect the children and told Carbahal to call 911 because he did not know whether anyone had been hit by the bullet. At this, Lambert said, "call the cops on me, I'll fucking kill you" and again charged at [petitioner]. Still "breathing very heavy" and "in a lot of pain," defendant fired the gun at Lambert in order to stop the threat to himself and protect his family from what he believed "would have been a massacre" if Lambert got the gun back.

[Petitioner] did not know whether Lambert was hit or not, but he fell to the floor on his hands and knees. Then, "quickly and effortlessly," Lambert went from that position to "taking a knee like a football player" to being "almost upright." Lambert said, "you and your family are fucking dead" as he quickly rose to his feet. Still afraid for his life, [petitioner] fired the fatal shot.

ECF No. 65-8 at 2-8.

At the conclusion of direct review, petitioner filed an application for writ of habeas corpus raising the same claims he had argued in state court.[5] ECF No. 1. In claim one, petitioner

---

[5] After petitioner elected to abandon claims 2, 3, and 4, the court directed respondent to file an

5

contends that the admission of his wife's statement to a police officer violated the Sixth Amendment Confrontation Clause and Crawford v. Washington, 541 U.S. 36 (2004). His next two claims for relief challenge the trial court's jury instructions on mutual combat (CALCRIM 3471) and provoking a fight or quarrel (CALCRIM 3472) as a violation of his right to due process because they were not supported by substantial evidence and confused the jury. Lastly, petitioner submits that he is entitled to habeas relief based on the cumulative error of the first three claims for relief.

Respondent filed an answer on April 6, 2023. ECF No. 63. First, respondent asserts that the California Court of Appeal's decision was objectively reasonable in finding the Confrontation Clause violation amounted to harmless error. Next, respondent argues that the jury instruction challenges are meritless and were reasonably rejected by the state court as harmless. Even under de novo review, the jury instructions did not have a substantial and injurious effect on the verdict so as to entitle petitioner to habeas relief. ECF No. 63 at 23 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). Lastly, according to respondent, the California Court of Appeal decision rejecting petitioner's cumulative error claim was reasonable, assuming that this actually constitutes a federal constitutional claim.

The time for petitioner to file a traverse has expired. Therefore, the matter has been fully briefed by the parties and is ready for decision.

**II.    AEDPA Standard of Review**

To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that the state court decision resolving the claim on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we

---

answer limited to claims 1, 5, 6 and 7. See ECF Nos. 58-59. Therefore, these Findings and Recommendations only address these claims which are pending before the court.

6

> have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)], that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Clearly established federal law also includes "the legal principles and standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding what law is "clearly established" and what constitutes "unreasonable application" of that law. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. See also Cullen v. Pinholster, 563 U.S. 170 (2011). Under § 2254(d)(2), factual findings of a state court are presumed to be correct subject only to a review of the record which demonstrates that the factual

finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be entitled to relief. Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).

### III.     Analysis

This court looks to the last reasoned state court decision in applying the 28 U.S.C. § 2254(d) standard. Wilson v. Sellers, 584 U.S. 122 (2018) (adopting the Ylst look through presumption of silent state court denials of relief even after the decision in Harrington v. Richter, 562 U.S. 86 (2011)); see also Ylst v. Nunnemaker, 501 U.S. 797 (1991)(establishing the "look through" doctrine in federal habeas cases). In this case, the last reasoned state court decision denying all four claims for relief is the California Court of Appeal decision. Thus, this court "looks through" the subsequent silent denial by the California Supreme Court and reviews the California Court of Appeal's decision for objective reasonableness under 28 U.S.C. § 2254(d). See Johnson v. Williams, 568 U.S. 289, 297 n. 1 (2013).

**A. Confrontation Clause Challenge in Claim One**

In his first claim for relief, petitioner asserts that the trial court's admission of his wife's hearsay statement to a police officer on the night of the shooting violated Crawford v. Washington, 541 U.S. 36 (2004), and his Sixth Amendment right to confrontation. The repetition of this statement by the prosecutor during petitioner's cross-examination rendered it prejudicial. According to petitioner, "[t]he jury's complete rejection of the prosecutor's theory of the case by its acquittal on the two murder counts, and its acceptance of [petitioner's] voluntary manslaughter defense, establishes that the state's evidence was weak, and that this was a close case." ECF No.

1 at 58.

The relevant factual background supporting this claim for relief was described by the California Court of Appeal.

> During [petitioner]'s cross-examination, the prosecutor questioned him concerning several phone conversations he had with K., [his wife], while he was in jail. In one of these phone calls, [petitioner] told K. that Lambert grabbed his gun. K. responded: "Oh he did?" Later, [petitioner] told K. "we need to make the case for deprivation of force." In another phone call, they argued over the facts of the shooting, specifically Lambert's position when [petitioner] fired the two shots that ended his life. In that conversation, when [petitioner] said, "he fuckin' pulled my gun and was pointing," K. interjected, "Yes," but then disagreed with [petitioner]'s conclusion of the sentence, "and was pointin' it right at me," saying: "No he pushing it . . . [¶] . . . [¶] towards your face. He was pushing it." After [petitioner] finished his version of how the first shot was fired, K. said: "I - I yeah.  See I - I don't - yeah - I don't - I don't remember." [Petitioner] also told K. their "job" would be to "discredit" Carbahal, to which K. acknowledged "he did see more than I did." During a third conversation, after [petitioner] described what was required for the shooting to have been in self-defense, K. said, "it's not like you chose - you did not choose to take out the gun[.]"
>
> After questioning [petitioner] about these conversations, the prosecutor asked [petitioner] whether he had read all of the police reports in the case. [Petitioner] said he had. The prosecutor then asked whether he wanted to discredit Carbahal because he said [petitioner] was the one who pulled out the gun. [Petitioner] said he did not recall. The prosecutor asked whether Carbahal's testimony was true, specifically that [petitioner] did pull out the gun, and that Lambert said as much during their struggle for the gun. [Petitioner] disagreed with both portions of Carbahal's testimony and agreed with the prosecutor that this disagreement was "part of the reason" he wanted to discredit Carbahal. Then, the prosecutor asked [petitioner] whether K. "makes the same comment that -- to the police that you pulled the gun out first and then [Lambert] makes a comment about you pull[ing] the gun out[.]" Defense counsel objected on hearsay grounds. The trial court overruled the objection. The prosecutor then restated the question: "In the police report your wife tells the police I believe on two occasions that it was you who pulled the gun out; correct?" Defense counsel again objected on hearsay grounds. Following an off-the-record discussion, the trial court again overruled the objection, stating: "For the effect on the hearer I would permit the question to be asked." After the prosecutor repeated the question a third time, [petitioner] answered: "She says that, yes."
>
> After eliciting [petitioner]'s response, i.e., K. told police [petitioner] was the one who first pulled out the gun, something he knew from having read a police report containing K.'s out-of-court statement, the prosecutor asked [petitioner] whether he agreed with the statement. [Petitioner] disagreed and said he did not believe K. was

9

> in the living room when the gun was pulled.
>
> The jury was not instructed K.'s out-of-court statement could not be considered to prove the truth of the matter asserted, specifically that [petitioner] was the one who pulled the gun on Lambert. Moreover, in closing argument, the prosecution told the jury to do just that, arguing they should not believe [petitioner]'s testimony in this regard because "[K.], [Carbahal], and [V.] all in one way or another tell you [petitioner] pulled the gun out."

ECF No. 65-8 at 8-10.

### 1. Last Reasoned State Court Opinion

After determining that the challenged statement contained two separate levels of hearsay from petitioner's wife as well as the police officer who wrote the report, the California Court of Appeal concluded that the statement was used by the prosecutor to prove the truth of the matter asserted, thus resulting in the improper admission of hearsay evidence. ECFR No. 65-8 at 12-13. Next, the state court determined that the statement was "testimonial" under clearly established Supreme Court precedent since Crawford because the wife "was questioned, not as part of an investigation into an ongoing emergency, but as part of an investigation into possibly criminal past conduct." ECF No. 65-8 at 16. Because petitioner did not have an opportunity to cross-examine his wife during trial, the state court determined that the admission of the testimonial hearsay violated petitioner's Sixth Amendment right to confrontation. ECF No. 65-8 at 17.

Ultimately, the California Court of Appeal deemed this error to be harmless beyond a reasonable doubt. ECF No. 65-8 at 17 (applying Chapman v. California, 386 U.S. 18 (1967), standard of harmless error). In so doing, the court reasoned as follows:

> [We first note the case against [petitioner] for murder was strong. However, the jury did not convict [petitioner] of murder, instead convicting him of voluntary manslaughter. The case against [petitioner] for that crime was overwhelming. As we have previously set forth in some detail, the testimony of Carbahal and V.[, Lambert's girlfriend], provided a compelling version of events in which [petitioner] was physically assaulted by Lambert after [petitioner] called V. a "tweaker." Lambert, much larger than [petitioner], quickly got the upper hand in the fight and was choking and punching [petitioner] when [petitioner] pulled out his gun to defend himself. At this point, Lambert and [petitioner] struggled for possession of the gun, K. jumped onto Lambert's back to try to pull him off of [petitioner], and Carbahal also joined in the struggle for the gun. The gun discharged, hitting no one, but knocking Lambert and Carbahal

10

to the ground. [Petitioner], now in sole possession of the gun, pointed and fired a second round at Lambert, hitting him in the jaw. Lambert fell face down on the floor. As Lambert struggled to get up, "like he was trying to do a pushup," [petitioner] took two steps towards him and fired a third round into the back of Lambert's head, killing him. The testimony of Carbahal and V., supporting this account of the shooting, was materially consistent both with each other's testimony and with their prior statements to police, and was also consistent with the forensic pathologist's testimony describing the injuries suffered by Lambert.

In contrast to this account, [petitioner]'s version of the shooting was inherently unbelievable. We decline to repeat it here, except to point out that [petitioner]'s vague account of "somehow" getting his gun back after it initially discharged was itself less than convincing. More importantly, however, his testimony that Lambert "quickly and effortlessly" rose from the floor after being shot the first time, while saying, "you and your family are fucking dead," was impossible given the nature of the first gunshot wound inflicted upon Lambert. That bullet hit Lambert in the jaw, traveled through the soft tissues of his neck, fracturing the cervical vertebrae, and lodged in his back. We have no doubt he was trying to get up, as Carbahal described, but no reasonable juror would have believed he was quickly and effortlessly rising to his feet while threatening [petitioner] and his family when the fatal shot was fired. Thus, even if the jury believed that [petitioner] believed he needed to fire that shot in self-defense, no reasonable juror would have found such a belief reasonable.

Stated simply, based on the compelling testimony of both Carbahal and V., their prior statements to police, the forensic pathologist's testimony, and [petitioner]'s patently incredible account of events, the very best [petitioner] could have hoped for was a voluntary manslaughter conviction.

Turning to the likely impact of K.'s out-of-court statement that [petitioner] pulled the gun on Lambert, we acknowledge this statement corroborated the testimony of Carbahal and V. in this regard, and undermined [petitioner]'s contrary testimony. However, whether [petitioner] or Lambert was the first to pull out the gun was not very important in terms of [petitioner]'s culpability. Assuming for purposes of analysis that K.'s statement was not admitted, and without the statement the jury believed [petitioner]'s testimony that Lambert pulled the gun on him, the first discharge of the gun was the result of a struggle for the gun, did not result in anyone being hit, and there was no dispute [petitioner] had sole possession of the gun when he intentionally fired the second two rounds at Lambert. The important shot for purposes of assessing [petitioner]'s culpability was the final shot. And as we have explained, [petitioner]'s testimony with respect to the circumstances under which he fired that shot was unbelievable for reasons independent of K.'s statement regarding who initially pulled out the gun. Moreover, even without this statement, the jury would have understood K. did not agree with [petitioner]'s account of events from the various jailhouse phone calls admitted into evidence.

11

> We have no difficulty concluding beyond a reasonable doubt that K.'s out-of-court statement concerning [petitioner] pulling out the gun did not contribute to [petitioner]'s voluntary manslaughter conviction.

ECF No. 65-8 at 17-19.

### 2. Clearly Established Federal Law

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[6] U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 68 (2004), the Supreme Court held that, before testimonial hearsay evidence may be admitted, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Subsequent decisions of the Supreme Court have further defined the types of statements that are "testimonial." See Davis v. Washington, 547 U.S. 813 (2006); Michigan v. Bryant, 562 U.S. 344 (2011). In Davis, 547 U.S. at 822, the Supreme Court concluded that statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." If testimonial statements have been admitted at trial without the guarantee of confrontation, the court must conduct a harmless error analysis to determine whether the error justifies relief. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

### 3. 28 U.S.C. § 2254(d) Analysis

Because the California Court of Appeal determined that the admission of the statement violated petitioner's right to confrontation under the Sixth Amendment, the ultimate issue before the court is whether the California Court of Appeal's conclusion that the error was harmless was objectively reasonable under 28 U.S.C. § 2254(d).[7] See Mitchell v. Esparza, 540 U.S. 12, 18

---

[6] This right is applied to state criminal prosecutions through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400 (1965).

[7] In the interests of judicial economy, the undersigned finds it unnecessary to determine whether the California Court of Appeal unreasonably applied Crawford in determining that the petitioner's wife's statement to police constituted testimonial hearsay.

(2003) (per curiam) (explaining that on federal habeas review the question is whether the state court's harmless error analysis was objectively reasonable). The undersigned finds that the state court applied the correct harmless error standard on direct review, and that, ultimately, its conclusion that the error was harmless was not objectively unreasonable. In this case, petitioner's wife's statement only concerned a tangential aspect of the case that did not address whether petitioner fired the final shot in self-defense as he claimed. When properly viewed in light of the evidence as a whole, the undersigned concludes that petitioner has not demonstrated that jurists of reason would disagree with the California Court of Appeal's harmless error analysis. See Harrington v. Richter, 562 U.S. at 101 (emphasizing that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.") (citation omitted). Thus, he is not entitled to habeas relief on claim one.

### B. Jury Instruction Challenges in Claims Five and Six

As described in petitioner's opening brief on appeal, "this case came down to whether [petitioner] acted in self-defense, as he claimed, or killed Lambert under a sudden heat of passion." ECF No. 1 at 22. The first jury instruction that petitioner challenges concerning mutual combat was requested by the prosecution and objected to by the defense at trial. Petitioner submits that there was not substantial evidence that petitioner actually engaged in mutual combat to support giving the instruction. Additionally, petitioner argues that there is a reasonable likelihood that the jury applied CALCRIM 3471 in a way that shifted the burden of proof to him to establish that he acted in self-defense, thereby violating his right to due process.[8] With respect

---

[8] CALCRIM No. 3471, as given to the jury in this case, provides:

> A person who engages in mutual combat or who starts a fight has a right to self-defense or imperfect self-defense, only if:
>
> 1. He actually and in good faith tried to stop fighting;
> 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
> AND
> 3. He gave his opponent a chance to stop fighting.

13

to CALCRIM 3472, petitioner asserts that there was not substantial evidence to justify instructing the jury with it because there is no evidence suggesting that petitioner provoked a fight with Lambert.[9]

### 1. Last Reasoned State Court Opinion

The California Court of Appeal assumed the challenged instructions were improperly given, but denied relief finding the error was harmless. "[The evidence overwhelmingly established defendant's conduct, at the very least, amounted to voluntary manslaughter. Any error in giving the jury these instructions was manifestly harmless under any standard of prejudice." ECF No. 65-3 at 20.

### 2. Clearly Established Federal Law

Erroneous jury instructions do not support federal habeas relief unless the infirm instruction so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (stating that "'it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]"). The challenged instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record

---

> If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.
>
> However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.
>
> A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

See ECF No. 65-3 at 157 (Clerk's Transcript) (italics in original).
[9] CALCRIM No. 3472, as given to the jury, provides: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." ECF No. 65-3 at 155.

14

overall. Estelle, 502 U.S. at 72.  Moreover, relief is only available if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  Id. at 72–73.

### 3. 28 U.S.C. § 2254(d) Analysis

The undersigned finds that the state court's harmless error analysis is not objectively unreasonable under 28 U.S.C. § 2254(d).  Petitioner does not suggest, much less point to any portion of the record, that would indicate that the jury misinterpreted the instructions given.  His argument is purely speculative.  Moreover, with respect to CALCRIM 3471, the totality of the record does not support petitioner's argument that the jury would have used this instruction to improperly shift the burden of proof on self-defense to him.  During closing argument, defense counsel emphasized, over and over, that the prosecution had the burden of proving that the killing was not done in self-defense.  "And, again, I can't emphasize this enough.  The district attorney has the massive burden of proving beyond all reasonable doubt that the killing was not justified.  They have to essentially disprove self-defense to leave you no doubt that it does not apply." ECF No. 65-2 at 185.  A review of the trial record in this case does not suggest that the jury would have applied CALCRIM 3471 as petitioner suggests.  See Victor v. Nebraska, 511 U.S. 1, 5–6 (1994) (stating that "the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there was a reasonable likelihood that the jury did so apply it.").  As the jury was properly instructed on the correct burden of proof and the jury instructions given, as a whole, do not suggest any ambiguity or misinterpretation by the jury, the state court did not unreasonably apply clearly established federal law in finding any error was harmless.  See Hedgpeth v. Pulido, 555 U.S. 57 (2008) (per curiam) (reversing grant of habeas relief on jury instruction claim finding harmless error analysis applied).

Furthermore, petitioner's arguments that CALCRIM 3471 and 3472 were not supported by substantial evidence only views the trial evidence myopically from the defense perspective.  It ignores the record evidence as a whole.  During the jury instruction conference, the prosecutor argued, and the trial court agreed, that there was a sufficient basis that petitioner provoked a fight or quarrel with the victim based upon petitioner's disparaging comments about the victim's

girlfriend. ECF No. 65-2 at 141. According to the trial court, "[The] People are going to argue it and I think the jury should be given instructions so they can determine, A, whether or not it applies, and, B, if it applies, how they are to use it." ECF No. 65-2 at 141. When the prosecution evidence is considered instead of just the defense evidence in isolation, this court does not find petitioner's argument to be persuasive. Reviewing the challenged instructions in the context of the overall trial record, as required by Estelle, this court does not find that state court's determination that any error in CALCRIM 3471 and 3472 was harmless was objectively unreasonable under 28 U.S.C. § 2254(d). Estelle, 502 U.S. at 72.

Even assuming that this court found the state court decision was unreasonable under § 2254(d), petitioner would still have to demonstrate that these jury instructions resulted in actual prejudice to him as a matter of de novo review under Brecht. See Calderon v. Coleman, 525 U.S. 141, 146-147 (1998). Petitioner does not even attempt to argue that the challenged jury instructions rose to the level of having "a substantial and injurious effect on the jury verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). This court finds that the use of CALCRIM 3471 and 3472 was harmless under Brecht. For all these reasons, petitioner is not entitled to habeas relief on his jury instruction challenges raised in claims five and six even when de novo review is applied.

### C. Cumulative Error Claim Raised in Claim Seven

Lastly, petitioner argues that the combined prejudice from all of his foregoing claims rises to the level of an independent constitutional violation entitling him to relief based on cumulative error.

#### 1. Last Reasoned State Court Opinion

The California Court of Appeal concluded in the last sentence of its opinion that "the cumulative prejudicial effect of the confrontation violation and assumed instructional errors does not require reversal." ECF No. 65-8 at 21. Having supplied no rational for this conclusion, this federal habeas court is tasked with determining what reasons exist in the record that could have supported the state court judgment. See Harrington v. Richter, 562 U.S. 86, 102 (2011).

/////

### 2. Clearly Established Federal Law

The Ninth Circuit Court of Appeal recognizes a free-standing claim of cumulative error in federal habeas proceedings when "the combined effect of multiple trial court errors violates due process" thus rendering the trial fundamentally unfair. Parle v. Runnels, 505 F.3d 922 (9th Cir. 2007)(citing Chambers v. Mississippi, 410 U.S. 284, 298 (1973)). A due process violation occurs when "the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

### 3. 28 U.S.C. § 2254(d) Analysis

The undersigned finds that even taken cumulatively, the assigned evidentiary and jury instructional errors in this case are not sufficient to render petitioner's trial fundamentally unfair in violation of due process. The court has already concluded that petitioner's two jury instruction challenges, even when put together, did not have a substantial and injurious effect or influence on the jury's verdict when reviewed de novo. See supra at Section B(3). Thus, the only remaining error to add to the prejudice analysis is the admission of petitioner's wife's statement that was contained in the police report.

This erroneously admitted statement concerned who was responsible for pulling the gun from petitioner's side holster before the first shot was fired. However, in this case, the jury was asked to decide whether petitioner was acting in self-defense when the second and third gunshots that killed Lambert were made. "[I]n determining whether the combined effect of multiple errors rendered a criminal defense 'far less persuasive' and had a 'substantial and injurious effect or influence' on the jury's verdict, the overall strength of the prosecution's case must be considered because 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Parle, 505 F.3d at 928 (quoting Strickland v. Washington, 466 U.S. 668, 696 (1984)).

This court is not convinced that even all three errors taken cumulatively had a substantial and injurious effect or influence on the jury's verdict. Petitioner's testimony was so thoroughly cross-examined at trial that the undersigned cannot conclude that his self-defense argument would have ever persuaded a jury that firing the third and final gunshot was reasonably necessary to

defend against the danger from Lambert in order to result in a total acquittal. A few examples from petitioner's cross-examination illustrate this point:

> Q: I mean you're now all of a sudden clear, well, I'm in a tough situation, but, you know I'm gonna wait and see if he gets up 'cause I only want to use reasonable force. That's what you're telling us?
>
> A: I wouldn't put it in that kind of condescending tone but –

ECF No. 65-2 at 26.

> Q: So you're telling your wife… that after the shot, she goes away, that Matt came and got you in a headlock. That's what you're telling her; is it not?
>
> A: I've had nightmares about headlocks.
>
> Q: This is what you're telling her.
>
> A: Yes.
>
> Q: This is the story that you're coming up with.
>
> A: No. My story – my testimony is not changing.

ECF No. 65-2 at 53.

> Q: And the law that you read basically says that for self-defense you have to be in imminent danger; right?
>
> A: Yes.
>
> Q: Okay. And so in court it's just a coincidence that you use the exact same words.
>
> A: I have a good vocabulary.
>
> Q: So it's a coincidence then; right?
>
> A: When I speak publicly, yes I have a good vocabulary….
>
> Q: Is it a coincidence, yes or no?
>
> A: No.

ECF No. 65-2 at 57.

In light of this cross-examination of petitioner at trial, the undersigned does not find that the claim of self-defense was rendered "far less persuasive" based on the evidentiary and jury instructional errors in this case. See Parle, 505 F.3d at 928 (explaining prejudice standard for cumulative error claim). The jury's rejection of self-defense and its verdict of voluntary

manslaughter was based on a credibility assessment of petitioner's testimony. Therefore, petitioner is not entitled to habeas relief on his cumulative error claim.

###    IV.    Plain Language Summary for Pro Se Party

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed your habeas corpus application and the trial court record in your case. The undersigned is recommending that your habeas petition be denied on the merits.

If you disagree with this result, you have 14 days to explain why it is incorrect. Label your explanation "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will then review the entire record and make the final decision in your case.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).

/////
/////
/////
/////
/////

Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  June 14, 2024

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/feci0878.merits.F&R